Roseman, J.
The Medical Malpractice Joint Underwriting Association of Massachusetts (“JUA”) seeks a declaration that the professional liability insurance policies it issued to the defendants, Harold L. Goldberg and Harold L. Goldberg, M.D., Inc. (sometimes “Goldberg”) do not cover the judgment against Goldberg, a psychiatrist, obtained in the Superior Court by one Witherspoon, his former patient, and reimbursement of the settlement amount JUA paid to Witherspoon on eve of argument before the Supreme Judicial Court on appeal by Goldberg seeking reversal of the judgment against him and by Witherspoon seeking to vacate the dismissal of her c. 93A claim. JUA also asks this Court, should it determine there is coverage in an amount greater than $1,000,000, to order reimbursement of $300,000, the statutory maximum, of the settlement amount of $1,875,000 from the Massachusetts In *205 surers Insolvency Fund, successors in obligations to American Universal Insurance Company.
Goldberg defends on a number of grounds, inter alia, no right of JUA to reimbursement, waiver, and failure of JUA to settle after demand had been made within policy limits. American Universal and the Insolvency Fund raise other defenses. In view of its ruling that JUA, in the circumstances here, is not entitled to reimbursement, the Court does not reach the claims against them.
JUA’s theory of recovery against Goldberg seems to rest on an agreement between it and Goldberg, if not expressed, then implied, that Goldberg would reimburse the settlement award should the coverage issues in this action be adjudicated in JUA’s favor. Accordingly, we examine JUA’s claims against Goldberg in that light, that is to say, we turn immediately to the question whether JUA, in these circumstances, is entitled to reimbursement assuming, arguendo, coverage did not exist.
The parties stipulated to certain facts in a document entitled “Stipulated Facts,” copy appended, which, in addition to matters found at the trial and set forth below, constitute the Court’s Findings of Fact. Because of the view of. the case taken by the Court, it recites those matters it deems critical to decision.
This matter originates in 1971 when Witherspoon, then 19, began therapy sessions with Goldberg. Witherspoon, depressed, was diagnosed by Goldberg as a “borderline personality,” a disorder characterized “by a poorly defined self-image.” Plaintiffs Trial Brief at 4.
In 1976, while in therapy, Goldberg and Witherspoon “discussed having a sexual relationship.” Id. On December 27, 1976, they first had sexual intercourse. That relationship continued for ten years. After the death of his wife in October 1986, Goldberg discontinued therapy with Witherspoon but continued to see and have sexual relations with her. When Goldberg refused to commit himself to Witherspoon, and refused to see her, Witherspoon suffered a mental breakdown, twice attempting suicide.
In early 1988, Witherspoon filed suit in Norfolk Superior Court charging Goldberg with negligence, intentional or negligent infliction of emotional distress, assault, battery, and breach of contract.
We now turn to the critical events.
Goldberg turned to his insurer, JUA, for defense and indemnity under a series of claims made and “occurrence” policies. The claims made policies, in part, provided:
that the JUA will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any claim or claims made against the insured during the policy period arising out of the performance of professional services rendered, or which should have been rendered . . .
The “occurrence” policies had a similar provision. They provided that JUA
will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of. . . injuries arising out of the rendering of or failure to render, during the policy period, professional services by the individual insured . . .
The limits of coverage were $1,000,000 per claim and $3,000,000 in the aggregate. Each policy gave JUA the discretion to settle “any claim or suit as it deems expedient.” None of the policies expressed a right in JUA, on settling a claim, to seek reimbursement from its insured of the amount paid. By letter of March 9, 1988, JUA notified Goldberg that it would provide him with a defense, retaining counsel subject to the following reservations:
1. The denial of coverage of any injury arising from conduct occurring during the period from spring 1971 through May 1, 1976 “and for any period when Ms. Witherspoon was not [Goldberg’s] patient.”
2. Disclaiming coverage of any act “which [Dr. Goldberg] did not intend to constitute professional medical services or [were] objectively outside the scope of professional services.”
3. Asserting the right “to disclaim coverage for all acts that involved an intent to injure or cause emotional harm” to Witherspoon.
Counsel took up their task of defense. By June 1989, counsel referred to the case as a “blazing forest fire.” In August 1989 Witherspoon amended her complaint founding her claim on theories of negligence, breach of contract, and violation of c. 93A. On December 13, 1989, in the midst of discovery with Goldberg’s liability to the charges reasonably apparent, Witherspoon’s lawyer made a written demand on JUA to settle for $ 1,000,000 or the policy limit, whichever was greater, reciting that it would remain open for thirty days. JUA did not respond. On February 20, 1990, Goldberg’s personal lawyer, Edward J. Barshak, Esq., who had filed an appearance the previous summer, wrote JUA and demanded that it settle the case within policy limits. On February 22, 1990, with the depositions of Goldberg and Witherspoon taken, counsel reported to JUA that the settlement demand still was $1,000,000, that the likelihood of a defendant’s verdict was “approaching zero,” that the value of the case was between $500,000 to $2,000,000 and that efforts should be made to settle within the $1,000,000 policy limit. On March 5, 1990 JUA responded to Mr. Barshak. It again denied coverage and stated that it intended to file a declaratory judgment action to resolve the coverage issue. JUA went on:
*206 Because of Dr. Goldberg’s admissions we agree that it is in his interest to settle the matter. However, in light of our view that there is no coverage, any settlement contribution we might make would be subject to an express reservation on the part of JUA to seek recovery of any settlement in the context of the to be filed declaratory judgment action.
On March 20, the case scheduled for trial in April, Mr. Barshak replied. Claiming JUA bore the obligation to settle within policy limits, and noting that Witherspoon’s demands were within such limits, Mr. Barshak wrote: “You made it clear you are not entertaining the demand on the merits because [you] claim there is no coverage ... Dr. Goldberg agrees that if you settle the case, the settlement will not be considered a waiver of your reservation of rights (for whatever value the reservation may have).” On that day, having reserved on or about March 15, 1990 $500,000 and, faced with a demand of $ 1,000,000, setting settlement authority at $350,000 on estimating Goldberg’s chance of a defense verdict as between 0 to 5% and judging the verdict range to be between $300,000 to $2,000,000, JUA offered $150,000 in settlement. On April 9, Witherspoon responded by increasing her demand to $2,000,000. Two days later, counsel advised JUA that Witherspoon’s economist estimated her future medical and lost earning capacity to be $2,161,544. On April 23, three days before trial, Witherspoon made a new demand of $3,000,000, or the policy limit. JUA did not accept and made no new offer.
We pause in our narrative to observe:
1. When JUA assumed Goldberg’s defense, it assumed the defense of a claim to which there was no defense on the merits. As it admitted on March 5, 1990, more than a month before trial, settlement was Goldberg’s only viable option.
2. Unilateral expression of intent by an insurer to reserve a right to reimbursement, without more, is simply unilateral.
The matter went to trial on April 26. Judge and jury left no doubt where they stood. Negligence having been stipulated, the jury found causation and awarded Witherspoon damages of $1,779,785. The court, ruling that c. 93A did not apply to the psychiatrist/patient relationship, dismissed Count 3.However, to avoid a retrial should it be determined by the appellate court that the statute applied, the judge adopted the jury answers to advisory questions and ruled that Goldberg’s conduct was “unfair and deceptive,” and his actions were “willful and knowing,” as those words are used by the statute. The judge assessed Witherspoon’s actual damages at $1,779,785 and ruled that she was entitled to treble damages of $5,339,335 and attorneys fees and costs. The parties filed cross appeals, Witherspoon contending that c. 93Awas applicable, and Goldberg seeking to reverse the judgment against him. JUA retained new counsel to represent Goldberg on appeal. JUA then filed the within action seeking a declaration of no coverage.
That was where matters stood when, on February 5, 1990, JUA’s coverage counsel informed Mr. Barshak that “JUA intended to make a settlement offer [of $1,000,000] to Witherspoon . . . [and] that ‘if the plaintiff does accept . . . JUA [reserves] all rights to pursue recovery from Dr. Goldberg personally any amounts paid to Ms. Witherspoon.’ ” Stip. ¶32.
On December 10, 1990, Mr. Barshak replied claiming that JUA and American Universal “were violating their obligations to Goldberg by failing to settle ... and demanded] that they settle the case.” Stip. ¶33.
The appeal was scheduled to be argued before the Supreme Judicial Court in June 1991. Just prior to argument, however, appellate counsel advised JUA that it was unlikely that Goldberg would be successful in reversing the judgment and that it was likely that c. 93A would be applied by the Supreme Judicial Court to the practice of psychiatry “thus leading to an award of treble damages plus interest and attorneys fees.” Stip. ¶36.
On that information, and without notice to Goldberg, JUA, on June 6, 1991, settled all of Witherspoon’s claims against Goldberg for $1,875,000. JUA then amended its complaint in this action to seek reimbursement of that amount.
CONCLUSIONS OF LAW
A. Breach of Covenant to Defend
When JUA assumed Goldberg’s defense, it assumed “a duly to negotiate and evaluate offers.” Traveler’s Insurance Co. v. Lesher. 231 Cal.Rptr. 791, 799 (1986). “The caliber of defense owed by the insurer once the defense is assumed is not affected by the existence of a coverage dispute between insurer and insured. (14 Couch, (2d. ed. 1982) §51.78 pp. 565-67.) Even when there is a coverage dispute, the insurer deciding whether or not to settle must conduct itself as if it alone were liable for the entire amount of the judgment. A belief that the policy does not provide coverage should not affect the insurer’s decision as to whether a settlement offer is a reasonable one. [citing Johansen v. California State Auto Association, Iter-Ins. Bureau (1975) 15 Cal.3d. 9, 15-16, 123 Cal.Rptr. 288, 530 P.2d. 744.)].” Id. Although no Massachusetts case has been cited which adopts this language, there is no reason to believe that Massachusetts would not follow the notion it articulates. See Magoun v. Liberty Mutual Insurance Co., 346 Mass. 677, 682, 684 (1964). Accordingly, the Court, in the circumstance where JUA assumed the defense of a matter its policy, arguendo, did not cover, imposes on JUA the duty fashioned by that language and turns to the question whether JUA is in breach.
*207 For “the carrier’s obligation to ‘evaluate the settlement [demand] as though the carrier itself were liable for the full amount of the claim’ ... to be meaningful, it must carry with it an obligation at least to conduct good faith settlement negotiations sufficient to ascertain the most favorable terms available and make an informed evaluation of the settlement demand.” Continental Cas. Co. v. USF&G, 516 F.Supp. 384, 389 (N.D. Cal. 1981) (footnote and internal citation omitted). Here, that standard was not met. By no later than February 22, 1990, after having characterized the case in June 1989 as a “blazing forest fire,” counsel informed JUA that the chance of a defendant’s verdict was “approaching zero,” that its value was between $500,000 to $2,000,000 and that efforts should be made to settle within the policy limits of $1,000,000. Rather than putting aside its coverage position and entering into good faith negotiations to secure “the most favorable terms available” for presentation to its insured for consideration, JUA made a token offer of $150,000 stimulating a retaliatory demand of $2,000,000, increased to $3,000,000, three days before trial. This record is devoid of any good faith attempt by JUA prior to trial to achieve a realistic settlement figure. Predictably, the trial resulted in a judgment against Goldberg of nearly $1.8 million with the distinct possibility of an additional award of $5,000,000 or more plus counsel fees. It only was after Goldberg’s appellate counsel admonished JUA of the futility of Goldberg’s chance to reverse the judgment and of the probability of a treble damage award and counsel fees, that JUA, without notice to Goldberg, to cut its own potential exposure should its coverage position not prevail, settled by payment to Witherspoon of $1,875,000.
That JUA allowed its coverage position to influence its duty to evaluate the settlement demand of $1,000,000 is shown by the communication to Mr. Barshak of March 5, 1990. Reserving its right to reimbursement, JUA conceded that it was in Goldberg’s “interest to settle the matter,” presumably at that figure, or a lesser amount that hard bargaining might produce. But due to its coverage position, it refused to bargain. Instead, 15 days later, JUA made a token offer of $150,000. I therefore find as a fact that JUA, putting its own position first, refused to evaluate the settlement demand of $ 1,000,000 and refused to engage in any meaningful negotiation with Witherspoon until after the Superior Court judgment, and then only to cut its potential exposure. Continental Cas. Co. v. USF&G, supra at 389.
Because of the view taken of its claim for reimbursement, the Court need not consider whether, on evidence of breach, the burden of production shifts to JUA to show that in no event could settlement in an amount less than the jury award have been reached, Id. 392, leaving Goldberg liable for payment of the jury award.
B. Reimbursement
Although there is no Massachusetts case in point cited to this Court, or known to it, recovery by an insurer in the nature of reimbursement has been granted on theories of contract, express or implied, and equitable restitution. Insurance Company of the West v. Haralambos Beverage Company, 241 Cal.Reptr. 427, 434 (1987); Johansen v. California State Auto Association Inter Insurance Bureau, 538 P.2d. 744, 750 (1975); St. Paul Mercury Insurance Company v. Ralee Engineering Company, 804 F.2d. 520, 522 (9th Cir. 1986); and Val’s Painting & Drywall, Inc. v. Allstate Insurance Co., 53 C.A.3d. 576, 586-88 (1975). In Johansen, supra at 750, the Supreme Court of California noted that
Moreover, contrary to defendant’s assertion, an insurer in defendant’s position retains the ability to enter an agreement with the insured reserving its right to assert a defense of noncoverage even if it accepts a settlement offer. If, having reserved such rights, and having accepted a reasonable offer, the insurer subsequently establishes the noncoverage of its policy, it would be free to seek reimbursement of the settlement payment from its insured.
Thus, I distinguish between an express or implied contract authorizing reimbursement and a unilateral reservation reserving a right to seek reimbursement. See, also St. Paul Mercury Insurance Company, supra at 522. The court rules there was no such agreement here.
The policies did not provide for reimbursement. JUA argues, however, that its March 5, 1990 letter in which, for the first time, it indicated that any contribution it might make to settlement “would be subject to an express reservation” to seek reimbursement, and Mr. Barshak’s response of March 20, 1990 that “Dr. Goldberg agrees . . . that . . . settlement will not be considered a waiver of your reservation of rights (for whatever value the reservation may have)” constitute a basis for its claim. The Court disagrees. The Court views this correspondence, at most, to be an acknowledgment by Goldberg that, should JUA settle, the fact of settlement will not compromise, legally, JUA’s coverage position, including its claimed right to seek reimbursement. Goldberg did not expressly or impliedly promise to reimburse JUA for funds, or a specific amount of funds, paid in indemnify should JUA’s coverage position prevail. The Court gives the same interpretation to the correspondence, supra, of December 1990.
The events of June 1991 do not lead to a different conclusion. Because of the opinion of Goldberg’s appellate counsel that there was substantial likelihood that c. 93A would be applied to the practice of psychiatry, “thus leading to an award of treble damages plus *208 interest and attorneys fees,” Stip. ¶36, JUA, without Goldberg’s knowledge, much less participation, entered, for the first time, into serious settlement discussions with Witherspoon and, on June 6, 1991, settled for $1,875,000. Two things thus are apparent. Goldberg did not authorize the amount paid Witherspoon thereby defeating JUA’s claim since an “insurer is not permitted to seek reimbursement for a particular settlement unless it has secured specific authority to make that settlement. . .” (emphasis supplied), Vals Painting & Dry wall, Inc., supra at 588; and second, that JUA settled to protect its, not Goldberg’s interests, thereby precluding JUA from reimbursement. See Insurance Company of the West, supra, 434, 435, and Traveler’s Insurance Co. v. Lesher, supra. Contrast, Abrams v. Factory Mutual Insurance Co., 298 Mass. 141, 143-44 (1937). Reimbursement is denied.
Before concluding, a word is offered about the dilemma of an insurer in the circumstance of JUA in this case. If an insurer assumes a defense without taking other action, it risks losing its right to later disclaim coverage. If it severs connection with the case, it risks liability for breach of its covenant to defend the insured. But if the insurer notifies the insured that it will defend under a reservation to later disclaim coverage, it is not estopped from making disclaimer where its insured was not “lulled into a false sense of security” by the insurer after the insured learned of the “ground for disclaimer.” Magoun v. Liberty Mutual Insurance Co., supra. However, an insurer who assumes a defense in the absence of a policy provision granting reimbursement, and in a circumstance where it denies liability to indemnify, has options. It may obtain an agreement from its insured to reimburse it should it pay a specified amount in indemnity; in the absence of such an agreement, it may continue to defend, including negotiating and evaluating settlement demands, tendering its best product to its insured for consideration; and, should judgment be rendered against its insured and coverage still be in dispute, it may litigate its coverage position, continuing to refuse payment of the indemnity until ordered to do so. Here, JUA did too little to defend Goldberg and too much to protect itself.
In view of the disposition, the declaration sought is not reached. Boston Safe Deposit & Trust Co. v. Dean, 361 Mass. 244, 248 (1972).
ORDER
The complaint is DISMISSED.
APPENDIX: STIPULATED FACTS
AGREED UPON ISSUES OF FACT[1] The Parties
1.The plaintiff is the Medical Malpractice Joint Underwriting Association of Massachusetts (hereinafter, “the JUA”), a nonprofit unincorporated association created by the Legislature.[2]
2. The defendant Harold L. Goldberg (hereinafter “Goldberg”) is or was a physician and psychiatrist who, at all relevant times, resided in Massachusetts.
3. The defendant Harold L. Goldberg, M.D., Inc., was, at all relevant times, a Massachusetts professional corporation.
4. The defendant American Universal Insurance Company is or was an insurance company with a principal place of business in Rhode Island. On or about January 8, 1991, American Universal was declared insolvent by the Rhode Island Superior Court.
5 The Massachusetts Insurers Insolvency Fund (“the Fund”) is a statutorily mandated, nonprofit, unincorporated association of insurers that pays certain “covered claims” of insolvent insurers up to a statutorily imposed $300,000 limit.
The Insurance Policies
6. from May 1, 1976 until February 12, 1982, Goldberg and his corporation were insured under a series of one-year claims made insurance policies issued by the JUA. In relevant part these policies provided:
that the JUA will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any claim or claims made against the insured during the policy period arising out of the performance of professional services rendered or which should have been rendered . . .
7. In or about the end of 1983, the insureds purchased a “Reporting Endorsement” effective February 12, 1984, permitting the reporting of claims under the last claims made policy issued. That endorsement provided “for the reporting of claims arising out of the performance of professional services rendered subsequent to the retroactive date indicated and prior to the termination date indicated.” The endorsement provided that the retroactive date was May 1, 1976 and the termination date was February 12, 1982.
8. From February 12, 1982 until November 1, 1989, Goldberg was insured under a series of one-year “occurrence” policies issued by the JUA. From May 15, 1987 until November 1, 1989, Goldberg’s corporation was a “Person Insured” under the “occurrence” policies issued to Goldberg.
9. In relevant part each “occurrence” policy provided that the JUA:
will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . injury arising out of the rendering of or failure to render, during the policy period, professional services by the individual insured . . .
*209 10. Each of the policies issued to Goldberg provided liability coverage in the amount of $1,000,000 per claim and in the amount of $3,000,000 in the aggregate.
11. Between August 9, 1982 and Februaiy 12, 1985, Goldberg was also insured under a series of excess insurance policies issued by American Universal. Each American Universal policy provided liability coverage with a limit of $3,000,000 per claim for sums paid as damages in excess of the underlying JUA policy limits. The American Universal policies incorporated the coverage provisions of the underlying JUA policies.
The Witherspoon Lawsuit and Settlement
12. In 1988, Jessie Witherspoon (hereinafter, “Witherspoon”) filed suit against Goldberg in Norfolk Superior Court. Witherspoon’s complaint alleged that she was a patient of Dr. Goldberg between 1976 and 1986.
13. Witherspoon’s initial complaint alleged negligence (Count I), intentional or reckless infliction of emotional distress (Count II), assault (Count III), battery (Count IV), and breach of contract (Count V).
14. The JUA retained the firm of Bloom & Buell to defend Goldberg. By a letter dated March 9, 1988 from the JUA’s claim representative, Barbara Staples, to Goldberg, the JUA advised Goldberg that it had retained Bloom & Buell and purported to reserve the JUA’s rights to disclaim coverage.
15. In August, 1989, Witherspoon filed an amended complaint. The amended complaint alleged negligenS (Count I), breach of contract (Count II), and violations of M.G.L.c. 93A (Count III). The amended complaint also named Goldberg’s corporation as an additional defendant.
16. In 1989 the Massachusetts Board of Registration in Medicine revoked Goldberg’s license to practice medicine.[3]
17. The trial of Witherspoon’s action began on April 26, 1990. In the trial, counsel for Goldberg stipulated to negligence and Witherspoon waived her contract claim.
18. The jury, in response to special questions, found causation and awarded damages to Witherspoon in the amount of $1,779,785. The specification of damages was as follows: $6,000 for medical expenses already incurred; $324,488 for medical expenses to be incurred; $268,541 for lost wages or earning capacity already incurred; $1,080,756 for lost wages or earning capacity to be incurred; and $100,000 for “pain and suffering, loss of companionship, embarrassment or other general damages” already incurred.
19. To aid the trial court in determining Goldberg’s liability under G.L.c. 93A, the court submitted two advisory questions to the jury. In answer to these questions, the jury found that Goldberg had employed “an unfair or deceptive practice” in the course of his treatment of Witherspoon and that he had done so “willfully or knowingly.”
20. In its Findings of Fact, Rulings of Law and Order to Judgment Under G.L.c. 93A, the trial court ruled that c. 93A did not apply to the psychiatrist-patient relationship and dismissed Count III of Witherspoon’s amended complaint. The court noted, however, that the applicability of c. 93A “is a question of first impression subject to reversal after consideration by the Appeals Court.” Accordingly, the court considered the matter “as if c. 93A does apply to acts which occur in the context of a psychiatrist/patient relationship.” The court proceeded to find that Goldberg’s conduct was “unfair and deceptive” within the meaning of c. 93A, and that his conduct was “willful and knowing.” The court found that Witherspoon’s actual damages totaled $1,779,785, and ruled that she would be entitled to recover treble damages of $5,339,355 plus attorneys fees and costs if c. 93A applied to the action.
21. By no later than the summer of 1989, the law firm of Sugarman, Rogers, Barshak & Cohen, P.C., was retained by Goldberg as his personal counsel in connection with the Witherspoon case.
22. On December 13, 1989, Witherspoon’s attorney, James D. Huegli, wrote to counsel retained by the JUA to defend Goldberg and demanded “$1,000,000 or the policy limit of Dr. Goldberg’s malpractice insurance policy, whichever is greater” to settle the case. Mr. Huegli’s letter stated that the demand would remain open for 30 days. The JUA did not respond to the demand within the 30-day period.
23. On February 20, 1990, Goldberg’s personal counsel, Edward J. Barshak, sent a letter to the JUA setting forth his position that any judgment against Goldberg in the Witherspoon case would be covered under the applicable JUA policies and demanding that the JUA settle the case within the policy limits.
24. On March 5, 1990, Michael Vaughan, the JUA’s claim representative, responded to Mr. Barshak’s letter. Mr. Vaughan wrote that any settlement contribution that the JUA might make would be subject to an express reservation on the part of the JUA to seek recovery of the settlement amount from Dr. Goldberg.
25. On March 20, 1990, Mr. Barshak wrote to Mr. Vaughan, again asserting that the JUA was obligated to defend Goldberg and pay any adverse judgment in the Witherspoon case and demanding that the JUA settle the case. In this letter, Mr. Barshak further stated that “Dr. Goldberg hereby agrees . .. that if you settle the case, the settlement will not be considered a waiver of your reservation of rights (for whatever value the reservation may have).”
26. On or about March 20, 1990 the JUA, through Goldberg’s defense counsel, conveyed to Witherspoon, through her attorneys, a settlement offer of $ 150,000.
*210 27. On April 9, 1990, Mr. Huegli responded to the JUA’s offer by increasing Witherspoon’s settlement demand to $2,000,000. The JUA did not accept this demand and did not increase its prior offer.
28. On April 23, 1990, three days before the trial commenced, Ms. Witherspoon’s co-counsel, Thomas F. Sullivan, made a new settlement demand of “$3,000,000 or the policy limits.” The JUA did not accept this demand and did not make any additional settlement offer before trial.
29. On May 7, 1990, after the juiy’s verdict, Ms. Staples, the JUA’s claim supervisor, wrote to Mr. Barshak informing him that the JUA continued to hold the view that Witherspoon’s claims were not covered by the JUA policies. Ms. Staples stated that the JUA intended to ñle a declaratory judgment action to resolve the coverage issue. Ms. Staples further stated that the JUA would continue to handle Goldberg’s defense, subject to a complete reservation of rights.
30. After the court’s judgment was entered, Witherspoon filed an appeal, contending that c. 93A was applicable and that she should be awarded treble damages of $5,339,355, plus interest and attorneys fees.
31. The JUA retained the firm of Goodwin, Procter & Hoar to provide a defense to Goldberg on appeal. Counsel retained by the JUA also filed a cross-appeal on behalf of Goldberg, seeking to reverse the judgment.
32. On December 5, 1990, before the appeal was argued, Steven L. Schreckinger, the JUA’s coverage counsel, wrote a letter to Mr. Barshak informing him that the JUA intended to make a settlement offer in the amount of $1,000,000 to Witherspoon. Mr. Schreckinger stated that “if the plaintiff does accept a settlement offer, the JUA is reserving all rights to pursue recovery from Dr. Goldberg personally any amounts paid to Ms. Witherspoon.”
33. On December 10, 1990, Mr. Barshak wrote to Mr. Schreckinger and to Edward L. Kirby, Jr., coverage counsel for American Universal, asserting that both the JUA and American Universal were violating their obligations to Goldberg by failing to settle the case and demanding that they settle the case.
34. On December 11, 1990, Mr. Schreckinger replied to Mr. Barshak, restating the JUA’s position that the JUA reserved its right to seek reimbursement from Goldberg for any settlement paid to Witherspoon.
35. Neither Mr. Barshak nor Goldberg responded to Mr. Schreckinger’s December 11 letter.
36. Goodwin, Procter & Hoar advised the JUA that it was unlikely that Goldberg would succeed in having the verdict for Witherspoon reversed on appeal. Goodwin, Procter & Hoar also advised the JUA that there was a substantial likelihood that c. 93A would be found on appeal to be applicable to the practice of psychiatry, thus leading to an award of treble damages plus interest and attorneys fees.
37. On June 6, 1991, the JUA entered into a full settlement with Witherspoon for $1,875,000.
38. As part of the settlement, Witherspoon released Goldberg and his corporation from all claims she may have had against them.
39. At no time before the settlement was reached did Goldberg or his counsel inform the JUA that it disputed the JUA’s reservation of its right to seek to recover the settlement amount. At no time after March 20,1990, did Goldberg or his counsel assert a position with regard to the JUA’s asserted reservation of rights to seek to recover the settlement amount.
40. After December 11 and prior to the settlement the JUA did not inform Goldberg or his counsel of the progress of the settlement negotiations or of the amount or terms of the proposed settlement. Neither Goldberg nor his counsel ever made a request for such information.
41. Prior to entering into the settlement, the JUA requested the Insolvency Fund to contribute its statutory maximum of $300,000 to the settlement. These requests included the following. On or about April 26, 1991, Ms. Staples asked Guaranty Fund Management Services to expedite the Fund’s review in response to the JUA’s request for a $300,000 contribution. On April 26, 1991, the JUA’s coverage counsel wrote to Mr. Kirby to request that the Fund contribute $300,000 toward a settlement. In addition, a member of the JUA’s board, James Burns, contacted the Fund with the JUA’s request. The Insolvency Fund declined to make any contribution to the settlement.
/S/THE MEDICAL MALPRACTICE JOINT UNDERWRITING ASSOCIATION OF MASSACHUSETTS, by its attorneys, Steven L. Schreckinger, Zick Rubin, Palmer & Dodge
/S/HAROLD L. GOLDBERG AND HAROLD L. GOLDBERG, M.D., INC., by its attorneys, Edward J. Barshak, Keiths. Brown, Sugarman, Rogers, Barshak & Cohen, P.C.
/S/MASSACHUSETTS INSURERS INSOLVENCY FUND, by its attorneys, Joseph Tanski, Alan J. Cooke, Hutchins, Wheeler & Dittmar

The parties agree that to the extent that there are inconsistencies between agreed upon facts and documents admitted into evidence, the contents of the documents will supersede the stipulated facts.

Since the time that this action was filed, the JUA’s name has been changed to the Massachusetts Medical Professional Insurance Association. For simplicity, the parties will continue to refer to the plaintiff as the JUA.

Goldberg reserves the right to object to the admissibility of this fact on relevance grounds.